IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WAYNE LEE BOWEN,<br><br>                       Petitioner,<br><br>           vs.<br><br>A. HEDPETH, Warden, Salinas Valley<br>State Prison,<br><br>                    Respondent. | No. 2:10-cv-01454-JKS<br><br>MEMORANDUM DECISION |

Wayne Lee Bowen, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  Bowen is currently in the custody of the California Department of Corrections and Community Supervision, incarcerated at the Salinas Valley State Prison. Respondent has answered.  Bowen has not replied.

### I.  BACKGROUND/PRIOR PROCEEDINGS

In February 2008 Bowen was convicted following a jury trial in the Lassen County Superior Court of Murder in the First-Degree, Cal. Penal Code § 187, with an enhancement for the personal use of a firearm, Cal. Penal Code § 12022.5(a)(1).  The trial court sentenced Bowen to an indeterminate prison term of twenty-seven years to life.  The California Court of Appeal, Third Appellate District, affirmed Bowen's conviction and sentence in an unpublished decision,[1] and the California Supreme Court denied review on November 10, 2009.  Bowen timely filed his Petition for relief in this Court on June 8, 2010.  On the same day, Bowen, appearing *pro se*, filed a Motion to Recall the Remittitur/Petition for a Writ of Habeas Corpus in the California Court of

---

[1] *People v. Bowen*, No. C058580, 2009 WL 2470510 (Cal. Ct. App. Aug. 13, 2009).

Appeal, Third Appellate District,[1] which was summarily denied without opinion or citation to

authority on July 15, 2010, and the California Supreme Court denied review on September 22,

2010.

The facts underlying Bowen's conviction are well known to the parties and are not set

forth herein except to the extent it may be necessary to understand the decision.

## II.  GROUNDS RAISED/DEFENSES

In his Petition, Bowen raises two grounds:  (1) the extensive delay in initiating criminal

proceedings against him violated his right to due process of law; and (2) he received ineffective

assistance of appellate counsel.  Respondent does not assert any affirmative defense.[2]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

---

[1] Bowen's filing was initially rejected as an improper attempt to file both the Motion to Recall the Remittitur and Petition for a Writ of habeas Corpus in a single document.  Bowen re-filed the document solely as a Motion to Recall the Remittitur.

[2] *See* Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011)

[3] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[7]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[8]  "[A]bsent a specific constitutional

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a

federal habeas proceeding, the standard under which this Court must assess the prejudicial

impact of constitutional error in a state court criminal trial is whether the error had a substantial

---

[4] *Williams*, 529 U.S. at 412 (alteration added).

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

and injurious effect or influence in determining the outcome.[10]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[12]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[13]  State appellate court decisions that summarily affirm a lower court's opinion without

---

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[13] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . .").

explanation are presumed to have adopted the reasoning of the lower court.[14]  This Court gives

the presumed decision of the state court the same AEDPA deference that it would give a

reasoned decision of the state court.[15]

## IV.  DISCUSSION

Ground 1:  Pre-accusation Delay

The victim was apparently killed sometime in July 1988.  His body was discovered in

October 1988.  Two bullets were recovered from the victim's skull.  Although the bullets were

heavily corroded, which prevented the bullets from being matched to a specific gun, the bullets

were consistent with .38 caliber and could have been fired from either a .357 magnum or a .38-

caliber revolver.  In 1994 and 1996 witnesses told authorities that Bowen had killed the victim.

An information charging Bowen with the murder was not filed until July 27, 2005.  Bowen

contends that the nearly ten years between the time the investigation was completed and the filing

of the charges violated his right to due process and prejudiced him.

The factual background and time line are extensively recited in the decision of the

California Court of Appeal.

---

[14] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[15] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

**BACKGROUND**

**The Burglary Ring**

Gregory Young, by his own admission a lifelong criminal and drug addict, met [Bowen], whom he knew from prison, in Reno in late March or early April 1988. [Bowen] was with Kevin Behm, whom [Bowen] called "The Kid." Young also knew Carla Faddis, who met [Bowen] around this time and became romantically involved with him.

[Bowen] and Young decided to commit burglaries together and share motel rooms with Faddis. While [Bowen] and Young committed daytime burglaries, Faddis would usually stay behind, although she participated as a driver once or twice. Both she and Young were consuming large amounts of drugs during this time, methamphetamine for Young and cocaine for Faddis.

Behm was allowed to participate in the burglary ring after [Bowen] vouched for him, but he turned out to be the weak link. Once, Behm was assigned to watch the front door during a burglary, but he was high on methamphetamine and Young found him digging in a toy box rather than watching the door. [Bowen] was only a little irritated, but he became angrier with Behm over time as his faults accumulated.

According to Young, the group later decided to burglarize a home in an upper middle class neighborhood in Reno. The burglars were using Faddis's car, which was prone to overheating and shutting down. Since the house was on a steep hill, [Bowen] and Young instructed Behm to park the car up the hill from the house, facing downhill, so that if the car overheated he could coast to them when they were ready to leave.

After they took what they wanted from the house and walked outside, Young looked up the road but did not see Behm where he was supposed to be. [Bowen] asked where Behm was; Young spotted the car parked the wrong way, facing up the hill. Young told [Bowen] they could push the car to get it pointed in the right direction, but [Bowen] said, "No, I'm out of here, I'm done with this. I'm killing that kid."

Young and Behm managed to get the car turned around, coast it down to the house, stop it, and fill it with the stolen items. They then coasted farther down the hill past [Bowen], who refused to get in. They managed to stop the car at a nursery at the bottom of the hill, where Young obtained water to cool the radiator enough to start it. Young then drove back and picked up [Bowen].

Swearing at Behm, who was in the back seat, [Bowen] told him, "You're an idiot, your [*sic*] dead, man. I'm tired of you, I'm just sick of you." Later, while the car was stopped at a traffic light, [Bowen] pointed a gun at Behm's face, saying, "You don't understand, I'll kill you. I'm going to kill you, man. You keep screwing up, I'm going to kill you." After Young told [Bowen] people in the truck next to them were watching, [Bowen] turned around and said, "Come on, let's go." Later, after they had dropped Behm off and were fencing the stolen goods, [Bowen] told Young, "The Kid's dead. I'm done messing with him, he's dead."

**The Killing**

6

In early July, a week to 10 days later, the group was staying at the Continental Lodge in Reno. [Bowen] told Young he knew the location of a marijuana field and was going there with Behm to steal from it. Knowing this was false, Young asked, "Oh, really?" [Bowen] responded, "Yeah, me and The Kid are going to go up, The Kid ain't coming back," and then had Young put a .38-caliber pistol stolen from a police officer's house under the driver's seat of the car.

[Bowen] and Behm left the room between 3:00 p.m. and 5:00 p.m. According to Faddis, [Bowen] said he was driving Behm to the Reno Greyhound bus station so Behm could go home to New York.

[Bowen] returned without Behm six to eight hours later, between 11:30 p.m. and 1:00 a.m. According to Young, [Bowen] then went to the bathroom, took off his clothes and shoes, and stuffed them in a bag. He then told Young to "[g]et rid of it good," and Young left the room to dispose of the clothes.

[Bowen] was taking a shower when Young returned five minutes later. A nervous and agitated [Bowen] ordered Young to tell Faddis he had dropped Behm off at the bus station. They checked out the next morning, but [Bowen] first told Faddis to thoroughly clean the room, which was unusual when they were checking out. Neither Young nor Faddis ever saw Behm again.

About a week later, Young was sitting on the curb in front of a 7-Eleven, drinking a Slurpee, when [Bowen] asked, "Do you think I should have buried him, Bro?" Young asked [Bowen] what he was talking about. [Bowen] asked again whether he should have buried Behm, telling Young not to worry as Behm did not suffer. [Bowen] continued: "Look, Greg, it's like this cup, when you get done drinking it, what do you do? You throw it away," a reference to throwing away an unnecessary criminal partner. He later told Young he had shot Behm in the back of the head about five miles up a trail to the marijuana field.

A couple of weeks after Faddis saw Behm for the last time, [Bowen] told her Behm was dead. Laughing, he said he had killed Behm after telling him they were going to steal the marijuana crop.

**The Ring Breaks Up**

George Seibert was added to the burglary ring after the Continental Lodge incident. Seibert testified that [Bowen] had him drive the two of them to Eagle Lake Road in order to steal from a marijuana field. After parking, they walked next to a dry creek bed for seven to 10 minutes. Seibert began to feel threatened when [Bowen], who was walking behind him, asked Seibert to walk on the rocks so as not to leave any footprints.

Seibert drew his gun and turned around to face [Bowen], telling him to get in front. [Bowen] did so and was walking in the sand, so Seibert told him to walk on the rocks so as to avoid leaving footprints. [Bowen] complied and they continued walking until Seibert stopped to relieve himself. [Bowen] walked off to the left and said, "Come on up here, I want to show you something." Seibert asked if there was any marijuana there, and [Bowen] said no. [Bowen] pointed Seibert to a spot where there was a "piece of vertebra, looked like it was hooked to a pelvis that was hooked

to a pair of blue pants." Bones were scattered about the site. Seibert said they should go and [Bowen] agreed.

In late August or early September, Seibert, [Bowen], Faddis, and Young were in a cottage motel on the north shore of Lake Tahoe. After Young told [Bowen] he was going to leave, [Bowen] hit Young in the jaw, knocking him out. An angry [Bowen] said he wanted to kill Young.

When Young awakened, [Bowen] was standing over him and said, "Now I got to kill you, now you made me got to kill you [*sic*]." Young begged for his life as [Bowen] picked up a .357 Magnum and pointed it at him. Young and Seibert left three to four days later.

After Young and Seibert left the group, [Bowen] took Faddis to the Eagle Lake turnoff near Susanville to show her where Behm was. After they pulled over, got out of the car, and crossed the road, [Bowen] and Faddis stopped by two large boulders on a "little hill." [Bowen] told Faddis he had directed Behm to walk over the hill to get to the crop and then had shot him in the head. He told Faddis she would be killed if she ever could not trust her.

Young and Seibert were arrested together on September 23, 1988; [Bowen] and Faddis were arrested five days later. Seibert told the police about being taken to the alleged marijuana field but did not tell the arresting officers about seeing human remains there. Young told officers he was afraid for his life as [Bowen] had already killed a coconspirator.

**The Body is Discovered**

In October of 1988 two hunters found human bones in an area off of Eagle Lake Road near Susanville, and a hiker found a human skull in the same area. The remains were those of Behm, who was fatally shot twice in the head from a distance of no more than five feet.

Two bullets were recovered from Behm's skull. The heavily corroded bullets were consistent with being .38-caliber ammunition, and could have been fired from a .357 Magnum or a .38-caliber revolver. Corrosion prevented the bullets from being matched to a specific gun.

**The Witnesses Come Forth**

In 1994 Faddis told Lassen County Sheriff's Investigator Bruce Stelzer about [Bowen's] taking her to Eagle Lake Road and admitting to killing Behm. She also directed Stelzer and other detectives to the place off of Eagle Lake Road where [Bowen] had taken her. The area was consistent with the general location of the "meltdown area" where Behm's body was found. Faddis pointed out boulders that were present when Behm's body was discovered in 1988. She also provided the detectives with details of the crime that had not been released to the media.

Faddis was afraid of [Bowen] and testified under a grant of immunity. After deciding to be truthful to law enforcement about Behm's murder, Faddis wrote a letter to Young asking him to come forth.

In 1996 detectives delivered Faddis's letter to Young while he was in prison, telling him Faddis needed his help as [Bowen] was getting out of prison and had

threatened Faddis's children.  Young agreed to talk and was later given immunity after telling investigators what he knew.

The first time Seibert told the police about seeing the human remains was in 2007.  He had been interviewed four or five times before then but had lied about his knowledge of the case.  Seibert did not say anything earlier because he was afraid of [Bowen] and thought he could be in trouble for not originally reporting the body.

Sergeant Stelzer found a police report matching Young's description of the burglary of the home on the hill.  The house was on a steep hill, the location Young described matched the location in the report, and there was a plant nursery at the bottom of the hill.  The police report was also consistent with Young's statement about stealing a gun from a police officer's house.  There was a 7-Eleven at the location mentioned by Young, and it had a Slurpee machine.

**Other Crimes**

In 1994 Redding police taped telephone conversations between [Bowen] and a man named Hamilton.  [Bowen] was in custody and sought to hire Hamilton to kill Troy Gay, the complaining witness against him in another case.  He offered Hamilton $5,000, an amount he would double if the body was not found.  [Bowen] was convicted of solicitation to commit murder as a result.

Hank Shaffer was a friend of [Bowen] in 1992 or 1993.  While on a hunting trip, [Bowen] told Shaffer that Faddis "knew something about him that could put him away for a long period of time."  [Bowen] told Shaffer that friends help each other out and asked Shaffer to take Faddis "out of the picture."  Shaffer believed taking Faddis out of the picture meant killing her.

**The Defense**

Brian Murphy, who has a prior conviction in Nevada for first degree murder, had known [Bowen] and Young since about 1980 and considered them both to be friends.  Young showed up at Murphy's house in the summer of 2007 and asked to borrow money.

Murphy asked Young about rumors that he was going to testify against [Bowen].  Young said [Bowen] was on his deathbed and "ain't ever going to go to trial."  Young did not want [Bowen] to get out of prison because he had previously stolen from [Bowen].  Young told Murphy, "I got the police buffaloed and I got a get out of free jail [*sic*] card."

Sergeant Stelzer, retired at the time of trial, was the investigating officer who interviewed Seibert in October 1995.  Seibert gave a general description of where the marijuana field could be found but never mentioned finding a body.

Seibert used the town of Viola, 74 miles from Susanville, as a reference point in describing the area.  He also told investigating officers the field was off of Highway 44 or 88. Highway 44 is five miles from Susanville.  Seibert seemed to be a little confused over which road the field was near.

Sergeant Stelzer also testified that in 1988 Seibert took other investigators to an area around Viola to look for a marijuana field.  He described the location in terms of Viola and its relation to Lassen Park, Highway 44, and Highway 88.  No marijuana field was found.

[Bowen], testifying in his own defense, denied killing Behm.  He took Seibert to a field near Viola, some 70 miles from Eagle Lake Road, thinking they would find marijuana to steal there.  [Bowen] had spent most of the day and night gambling when Behm disappeared.  He admitted the group stayed at the Continental Lodge in Reno on July 13, 1988.  Although he had hunted in the Eagle Lake Road area, he denied taking Seibert or Faddis there.  He admitted to prior convictions for felony assault and solicitation of murder.

**Rebuttal**

Nevada records show that Young has continuously been in the custody of the Nevada Department of Corrections since July 2006.

**Motions for Dismissal**

In December 2005 [Bowen] filed a pretrial motion to dismiss for prosecutorial delay. The motion was heard the next month, and the court deferred ruling until hearing the evidence at trial.

Proceedings were suspended from May 2006 to September 2007 because of [Bowen's] poor health.  The trial started in January 2008 and [Bowen] renewed the motion to dismiss, which the court denied without prejudice pending consideration of the trial evidence.

After the jury convicted [Bowen], the court denied his motion to dismiss, finding [Bowen] had not been prejudiced by the delay.[16]

In rejecting Bowen's arguments, the Court of Appeal held:

**DISCUSSION**

**I.  PROSECUTORIAL DELAY**

The information in this case was filed on July 27, 2005.  In 1994 and 1996 Faddis and Young told the authorities that defendant had killed Behm.  Defendant contends the 10 years between the effective completion of the investigation and the filing of charges violated due process and so prejudiced him that dismissal is the only remedy.  We disagree.

An unreasonable delay between the time an offense is committed and an accusatory pleading is filed may violate both state and federal constitutional due process rights.  (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 504-505.)  To assess such an alleged violation, the court must balance any prejudice to the defendant against the justification for the delay.  (*Id.* at p. 505; accord, *People v. Catlin* (2001) 26 Cal.4th 81, 107.)  However, the defendant has the initial burden to adduce some evidence of actual prejudice.  (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 249-250.)  Speculation based on general claims that witnesses and evidence are unavailable or witnesses' memories have faded is insufficient to discharge the defendants burden. (*Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, 946.)  We review the trial court's denial of a motion to dismiss on the ground

---

[16] *Bowen*, 2009 WL 2470510 at *1-5.

of precharge delay only for abuse of discretion.  (*People v. Morris* (1988) 46 Cal.3d 1, 38, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-545, fns. 5 & 6.)

In making the posttrial motion to dismiss, defense counsel claimed to have been surprised when Seibert was called as a witness at the end of the trial, since the prosecutor had not mentioned Seibert in her opening statement.  Counsel made an offer of proof that a defense investigator was immediately asked to locate one or both of the sheriff's deputies who accompanied Seibert to the marijuana field location.  The investigator was able to locate one of them, a Deputy Newsom, on the weekend before the last defense evidence was submitted on the following Monday.

Deputy Newsom was in a hospital bed in his house, recovering from major leg surgery and under a nurse's care.  He was in no position and had no ability to travel to testify.  The deputy had only the vaguest recollection of looking for a marijuana field in connection with a criminal investigation some 20 years earlier.

Defense counsel argued that had the case been tried in 1994 or 1995 Deputy Newsom presumably would have had a memory of the event.  Counsel claimed this would have seriously undermined Seibert's credibility, as it could have established he lied about the location of the marijuana field.  Defense counsel also accused the People of sandbagging [Bowen] by holding Seibert's testimony until the last day of the trial.

In rejecting [Bowen's] claim, the court explained Seibert's testimony was not "particularly convincing or probative," he was "clearly impeached," and the jury was able to determine his credibility "independent of any evidence that could have been brought before the jury in rebuttal of what was not already done."

[Bowen] argues on appeal that Seibert's testimony was important corroborating evidence of Faddis's testimony describing her trip with [Bowen] to the fictitious marijuana field where [Bowen] told her Behm was murdered.  He asserts that if [Bowen] had been tried in 1995, Deputy Newsom could have been called to testify that Seibert took him to an "entirely different location" from the Eagle Lake Road site.

Since Faddis described the location as no more than 30 to 40 feet from Eagle Lake Road while the remains were actually 1,000 feet from the road, [Bowen] asserts impeaching Seibert's testimony was important as it would have also undercut the credibility of Faddis's testimony.  If the jury had not believed Seibert or Faddis, [Bowen] claims it could not have convicted him as the testimony of Young, an accomplice, would have been insufficient by itself to convict [Bowen].  While Sergeant Stelzer did recount a taped interview of Seibert during which he gave an inaccurate description of the site's location, [Bowen] argues this could not have had the same impact as "the testimony of Deputy Newsom, who actually accompanied Mr. Seibert into the field at a location other than Eagle Lake Road."

Sergeant Stelzer's testimony provided the jury with the information necessary to assess Seibert's credibility.  The jurors were told that in a taped interview Seibert described the location as being near the town of Viola, and that in 1988 he took officers to the Viola area in an unsuccessful attempt to find the marijuana field.

Assuming he could have recalled the event in 1994 or 1995, at best Deputy Newsom could have added details to Sergeant Stelzer's testimony, describing more specifically where Seibert took them and his demeanor during the unsuccessful search for the marijuana field.

Placed in the context of the compelling evidence of [Bowen's] guilt, the extra details Deputy Newsom might have provided would not have influenced the jury's verdict. With their testimony, Young and Faddis corroborated each other on numerous points, including [Bowen's] fight with Young and the incident at the Continental Lodge. It is true Faddis described walking only 30 or 40 feet from Eagle Lake Road while the main decomposition area was about 1,000 feet from the road. However, even if she did not provide the precise location of the site where the body was found, Faddis's ability to identify an area very close to the murder site supports her credibility. In addition, Faddis was able to provide authorities with details concerning the murder that were not released to the media.

Young's testimony was corroborated by other evidence on several key points. He testified to placing a .38-caliber handgun in the car for [Bowen], a weapon which could have fired the shots according to the forensic testimony. His description of the burglary of a house on a steep hill was consistent with police reports.

In light of the compelling evidence of [Bowen's] guilt and the evidence already impeaching Seibert's testimony, we conclude [Bowen] was not prejudiced by the delay. We therefore decline to address the Attorney General's contention that [Bowen's] failure to renew his motion at the conclusion of the evidence forfeited the claim.[17]

The due process test for impermissible pre-accusation delay requires a delicate balance of the circumstances of each case.[18] The Supreme Court has made clear that primarily the court must compare the gravity of the actual prejudice shown to the reasons for the delay, and that the first prong is that the defendant must show "actual prejudice" occurred from the delay.[18] As the Ninth Circuit has noted: "First, it is well recognized that delay by itself is only evidence of possible prejudice, not actual prejudice. The due process calculus is not even brought into play until actual prejudice is shown. This is largely because 'the law has provided other mechanisms

---

[17] *Id.* at *5-7.

[18] *See United States v. Marion*, 404 U.S. 307, 324-25 (1971).

[18] *United States v. Lovasco*, 431 U.S. 783, 789-97 (1977); *see United States v. Moran*, 759 F.2d 777, 780 (9th Cir. 1985).

to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge.'"[19]  Applicable statutes of limitation are "the primary guarantee bringing overly stale charges."[20]  Under California law there is no limitation period for bringing a murder charge.[21]

Unquestionably, the prosecutor had probable cause by 1996 to bring the charges against Bowen.  The Supreme Court has, however, made clear that is not the test.  "[P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."[22]  The Supreme Court further differentiated between investigative delay and delay solely to gain tactical advantage over the accused.[23]  The former, investigative delay, is present in this case, while the later, to gain a tactical advantage, is not.  The Supreme Court held that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time"[24]  Finally, the Supreme Court, after noting that it had conceded in *Marion* that it could not determine in the abstract the circumstances in which pre-accusation delay would require dismissal and the paucity of cases in which defendants

---

[19] *Arnold v. McCarthy*, 566 F.2d 1377, 1383 n.1 (quoting *Marion*, 404 U.S. at 422).

[20] *United States v. Ewell*, 383 U.S. 116, 122 (1966); *see Lovasco*, 431 U.S. at 789.

[21] *People v. Archerd*, 477 P.2d 421, 437 (Cal. 1970), *abrogated on another ground in People v. Nelson*, 185 P.3d 49 (Cal. 2008).

[22] *Lovasco*, 431 U.S. at 791.  The Supreme Court went even further, declining to adopt a constitutional rule that would require the prompt filing of charges as soon as enough evidence was assembled to prove guilt beyond a reasonable doubt, but before the investigation was completed.  *Id.* at 792-93.

[23] *Id.* at 795-96.

[24] *Id.* at 796.

13

established they had been prejudiced, left "to the lower courts, in the first instance, the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases."[25]  Because the Supreme Court left it to the lower courts to determine when the facts presented appropriate circumstances to dismiss for pre-accusation delay, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[26]  Bowen is not entitled to relief under his first ground.

Ground 2:  Ineffective Appellate Counsel

In the Appellant's Opening Brief under the heading of "C.  The Federal Law of Pre-Accusation Delay," was the following footnote:  "But pre-arrest delay does not implicate Sixth Amendment speedy trial rights or the California Constitution's guarantee of a speedy trial."[27]  According to Bowen, citing *People v. Mirenda*,[28] this is incorrect, i.e., that under *Mirenda*, speedy trial cases are actually instructive on the question of prejudice.  Bowen argues that in not bringing *Mirenda* to the attention of the California Court of Appeal, his appellate counsel was

---

[25] *Id.* at 796-97.

[26] 28 U.S.C. § 2254(d); *see Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations"); *Richter*, 131 S. Ct. at 778 (same citing *Yarborough*); *Renico v. Lett*, 130 S. Ct. 1855, 1864 (2010) (same, citing *Yarborough*).

[27] Lodged Doc. A at 19, n.5 (citing *Marion*, 404 U.S. at 324; *People v. Nelson*, 43 Cal.4th 1242, 1249-50 (2008)).

[28] 95 Cal. Rptr. 3d 702, 714 (Ct. App. 2009).

ineffective.  Bowen presented this argument to the California appellate courts in his *pro se*

Motion to Recall the Remittitur.  Both the California Court of Appeal and California Supreme

Court summarily denied Bowen's motion without opinion or citation to authority.

A state court is not required to give reasons before its decision can be deemed to be

"adjudicated on the merits."[29]  When there is no reasoned state-court decision denying an issue

presented to the state court, "it may be presumed that the state court adjudicated the claim on the

merits in the absence of any indication or state-law procedural principles to the contrary."[30]  "The

presumption may be overcome when there is reason to think that some other explanation for the

state court's decision is more likely."[31]  Where the presumption applies, this Court must perform

an independent review of the record to ascertain whether the state-court decision was

"objectively unreasonable."[32]  In conducting an independent review of the record, this Court

presumes that the relevant state-court decision rested on federal grounds,[33] giving that presumed

decision the same deference as a reasoned decision.[34]  The scope of this review is for clear error

of the state court ruling on the petition:

---

[29] *Richter*, 131 S. Ct. at 785.

[30] *Id*. at 784-85.

[31] *Id.* at 785.

[32] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).

[33] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

[34] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the "objectively reasonable" lens ground by *Williams*. . . . Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.  Only by that examination may we determine whether the state court's decision was objectively reasonable.[35]

"[A]lthough we independently review the record, we still defer to the state court's ultimate decision."[36]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Bowen must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[37]  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[38]  Bowen must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[39]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was

---

[35] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted). *But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not controlled by *Delgado v. Lewis* . . . . There, we held that where a state court provides no rational for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was objectively unreasonable based on its independent reading of the record.  Here, however, the state court was not silent as to its reasoning . . . .  Therefore, we review de novo whether Lewis waived his right to conflict free counsel . . . .").

[36] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

[37] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[38] *Id*.

[39] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

fundamentally unfair or unreliable, is defective."[40]   An ineffective assistance of counsel claim

should be denied if the petitioner fails to make a sufficient showing under either one of the

*Strickland* prongs.[41]

> In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:
>
> > The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[42]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims

under the § 2254(d)(1) standard.[43]

The Supreme Court, applying the "doubly deferential standard," has made clear that when

adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the

---

[40] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[41] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[42] *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009).

[43] *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard. Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different from an *incorrect* application of federal law."[44]

Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[45]

Bowen relies upon the following statement in *Mirenda*:

In addition, although a federal speedy trial case, the reasoning in *Doggett, supra,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520, is instructive on the issue of showing prejudice for analyzing either speedy trial or due process violations as the constitutional guarantees "converge in protecting the same interest of the accused" for a fair adjudication. (See *Martinez, supra,* 22 Cal.4th at p. 768, 94 Cal.Rptr.2d 381, 996 P.2d 32.) The court in *Doggett* noted "that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.' [Citation.] And although time can tilt the case against either side, [citations], one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment [speedy trial] claim ..., it is part of the mix of relevant facts, and its importance increases with the length of the delay." (*Doggett, supra,* 505 U.S. at pp. 655–656, 112 S.Ct. 2686.)

If the defendant meets his initial burden of showing prejudice from a preaccusation delay for either a due process or state constitutional speedy trial claim, "the prosecution must show justification for the delay. If the prosecution does that, the trial court must balance the prejudice to the defendant resulting from the delay against the prosecution's justification for the delay. [Citation.]" (*People v. Lowe* (2007) 40 Cal.4th 937, 942, 56 Cal.Rptr.3d 209, 154 P.3d 358; *Martinez, supra,* 22 Cal.4th at pp. 766–767, 94 Cal.Rptr.2d 381, 996 P.2d 32.)[46]

---

[44] *Richter*, 131 S. Ct. at 785 (emphasis in the original).

[45] *Id.* at 786.

[46] 95 Cal. Rptr. 3d at 714.

Initially, this Court notes that Appellant's Opening Brief was served and filed September 29, 2008, and the Reply Brief on March 13, 2009.  The decision in *Mirenda* was handed down on June 16, 2009, three months *after* the Reply Brief was filed.  Bowen argues that, because the Court of Appeal decision in this case was not filed until August 13, 2009, appellate counsel should have brought this "important case" to the attention of the appellate court.  For the reasons that follow, this Court disagrees.

First, the challenged statement in the footnote is a correct statement of the law—as the cited cases hold, the Sixth Amendment right to a speedy trial is not "implicated."  Second, taken in context, the statement cannot reasonably be construed to preclude the application of similar principles of determining the prejudice prong of speedy trial violations and those involving pre-accusation delay.  *Mirenda* does nothing more than restate the unremarkable and well-established principle of pre-accusation delay, i.e., the need for actual prejudice.  Counsel devoted six and a half pages in Appellant's Opening Brief and another two pages in Appellant's Reply Brief to the subject of the prejudice Bowen suffered as a result of the pre-accusation delay in this case.[47]  The failure to cite a non-controlling intermediate appellate court decision that does nothing more than address the same legal principle argued in a brief, even if from a slightly different perspective, hardly rises to the level of an error "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[48]  Finally, as noted above, the California Court of Appeal

---

[47] Lodged Doc. A, at 20-26; Lodged Doc. C at 8-9.

[48] *Strickland*, 466 U.S. at 687; *cf. Davis v. Norris*, 423 F.3d 868, 877-78 (8th Cir. 2005) (failure to cite state supreme court decision that left a question open not ineffective assistance); *Underwood v. United States*, 15 F.3d 16, 17-18 (2d Cir. 1993) (failure to cite a particular case that did not represent an intervening change in law rather than failing to raise an issue entirely is not ineffective assistance of counsel).

addressed the prejudice issue in depth, and its analysis does not substantially differ from the prejudice analysis in *Mirenda*.

Bowen has failed to overcome the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance or that his defense was prejudiced by the alleged omission as required by *Strickland-Hill*.  This Court cannot say that the assumed decisions of the California Court of Appeal and California Supreme Court that *Mirenda* did not compel reversal were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[49]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state courts unreasonably applied the correct legal principle to the facts of Bowen's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state-court decisions were not more than incorrect or erroneous, their application of clearly established federal law was not objectively unreasonable.  Bowen is not entitled to relief under his second ground.

---

[49] 28 U.S.C. § 2254(d).

## V.  CONCLUSION AND ORDER

Bowen is not entitled to relief on either ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[50]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[51]

The Clerk of the Court is to enter judgment accordingly.

Dated: June 5, 2012.

                                        /s/ James K. Singleton, Jr.
                                        JAMES K. SINGLETON, JR.
                                        United States District Judge

---

[50] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[51] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.